HENSEL, BRUCKMANN & LORBACHER, INC. *v.* UNITED STATES

No. 5097.—Invoice dated Singen-Hohentwiel, Germany, August 17, 1938.
Certified August 20, 1938.
Entered at New York September 6, 1938.
Entry No. 725093.

(Decided January 21, 1941)

*Eugene R. Pickrell* for the plaintiff.
*Charles D. Lawrence*, Acting Assistant Attorney General (*Samuel D. Spector*,
special attorney), for the defendant.

KINCHELOE, Judge: This appeal to reappraisement involves certain
aluminum metal covered paper imported from Germany on August 17,

1938. Three different kinds of such paper are involved in the importation in question, their invoice descriptions being as follows:

(1) Metal covered paper 48 S 75–44 lbs. Edelweiss 12 er reddish gold coloured bright on rolls, width 26'', core hole 3''.

(2) Metal covered paper 46 S 75–44 lbs. Edelweiss 12 er silver bright satin finished on rolls, width 26'', core hole 3''.

(3) Metal covered paper bubbles design S 75–44 lbs. cellulose 9 er silver bright two color print on rolls, width 24'', core hole 3''.

Said merchandise was entered at the invoice net values, which, it is claimed, represent the proper dutiable export values, and it was appraised at the foreign-market values, representing an advance of approximately 35 per centum over the entered values.

In claiming that export value, as such value is defined in section 402 (d) of the Tariff Act of 1930, is the proper basis for appraisement of the instant merchandise, plaintiff makes two contentions, to wit: first, that the imported aluminum metal covered paper involved herein is not such as or similar to the aluminum metal covered paper sold or offered for sale for home consumption in the foreign market; and, second, that if the aluminum metal covered paper sold or offered for sale for home consumption in Germany be considered such as or similar to the merchandise in question, nevertheless the said foreign market is a controlled or restricted market for said merchandise, and therefore the values at which the merchandise was sold or offered for sale therein at the time of exportation of the instant merchandise do not represent foreign-market value, within the statutory meaning of such value.

All of the evidence introduced herein, both oral and documentary, was offered by the plaintiff, and at the conclusion of the trial counsel for defendant moved to dismiss the instant appeal on the ground plaintiff had failed to make out a *prima facie* case.

The only evidence offered by plaintiff to show dissimilarity of the merchandise in question and the aluminum metal covered paper sold or offered for sale for home consumption in Germany was an affidavit, exhibit 23 herein, of the plant manager of the Breisgau-Walzwerk, G. m. b. H., the exporter of the instant merchandise, and the Aluminum-Walzwerke Singen, G. m. b. H., two companies organized and operating under the laws of Germany with offices and factories at Singen-Hohentwiel, Germany.

After stating that he was in charge of the manufacture and sale of all aluminum metal covered paper manufactured and sold by the firms of which he was plant manager during the period with which we are concerned for the purposes of this case, said affiant testified to certain distinguishing characteristics between the imported merchandise in question and the comparable product sold and offered for sale for home consumption in the foreign market. In that connection, the witness testified in substance that the aluminum metal covered paper manufactured in the foreign market and sold for ex-

port to the United States was produced in broad rolls and was made of a mixture of scrap aluminum and aluminum of the commercial standard quality, purity 99.3–99.5 per centum, and was heavier and of greater thickness than the aluminum metal covered paper sold for home consumption which was made on narrow rolls and produced from aluminum of a commercial standard quality, purity 99.3–99.5 per centum, which produced a paper "softer, not brittle, and had less tensile strength than the aluminum metal covered paper produced by these firms and sold for export to the United States of America." Said witness further testified that the production cost of the aluminum metal covered paper produced and sold for export was "10 to 25% lower than the production costs of the aluminum metal covered paper sold during this time for domestic consumption in Germany."

The matter of similarity of imported merchandise with a comparable product sold for home consumption in the foreign market has been the subject of much litigation both in this court and in the Court of Customs and Patent Appeals. In the case of *United States* v. *Irving Massin & Bros.* (16 C. C. P. A. 19, T. D. 42714), our appellate court construed the word "similar" as it is used in section 402 of the Tariff Act of 1930, as follows:

In view of the common meaning of the word "similar" and of the authorities cited, we are of opinion, and so hold, that if goods are made of approximately the same materials, are commercially interchangeable, are adapted to substantially the same uses, and are so used, ordinarily, they are similar, within the meaning of section 402 (b).

And that rule was followed in later decisions involving the question of similarity, for appraisement purposes, of imported merchandise with comparable merchandise in the foreign market. *United States* v. *Wecker & Co.* (16 C. C. P. A. 220, T. D. 42837); *Scharf Bros. Co.* v. *United States* (16 C. C. P. A. 347, T. D. 43089); *Meadows, Wye & Co., Inc.* v. *United States* (17 C. C. P. A. 36, T. D. 43324); *United States* v. *Kraft Phenix Cheese Corp. et al.* (26 C. C. P. A. 224, C. A. D. 21). Equality in value and similarity in cost of production are also factors which the court have considered in determining the issue of similarity between imported merchandise and a comparable product sold and offered for sale for home consumption in the foreign market. *United States* v. *Thomas* (21 C. C. P. A. 254, T. D. 46788).

While all of the factors mentioned have influenced the courts in their determination of the said issue of similarity, in none of the authorities on the subject has the court laid down a definite rule to be followed in deciding such issue. For example, in the case of *United States* v. *Vietor & Achelis* (17 C. C. P. A. 412, T. D. 43864), the sole reason for holding goods dissimilar was because their values were different. In the case of *Scharf Bros. Co., Inc.* v. *United States* (16 Ct. Cust. Appls. 347, T. D. 43089), a difference in cost of pro-

duction was not permitted to be a bar to a finding of similarity. In other words, whether or not two classes of merchandise are similar or dissimilar for tariff purposes is dependent entirely upon the facts in each individual case.

That the imported aluminum metal covered paper in question is produced in broader rolls than that sold for home consumption in the German market, has no bearing on the question of similarity involved herein. The merchandise before the court for appraisement is the paper *per se*, and not the *rolls* of paper, and all consideration to the issues presented in this case are directed solely to the merchandise *per se*. *United States* v. *Arkell Safety Bag Co.* (22 C. C. P. A. 262; T. D. 47210).

Hence I find from the proof adduced on the question of similarity of the imported paper with that sold in the foreign market for home consumption that the merchandise in question in this appeal for reappraisement is made of an inferior grade of aluminum than that sold for home consumption and consequently the production cost of the instant merchandise is lower, and also that it is heavier and of greater thickness than the comparable product sold in the German market. But the record is barren on the question of similarity of use or adaptability of use of both kinds of paper. In all of the authorities hereinabove cited the element of use was considered and regarded as a vital factor to the conclusions reached therein, and, in my judgment, the question of use of the imported paper and the comparable product sold or offered for sale for home consumption in the foreign market is equally important to a proper determination of the issue of similarity presented herein. In his brief counsel for plaintiff argues that "there necessarily is a difference in the use of these two commodities, and they are not commercially interchangeable." But that is merely a statement of said counsel and, in my judgment, is not founded on any competent evidence of record. As far as I can determine from the evidence introduced herein on the question of similarity, the witness in his affidavit, said exhibit 23, has merely set forth specifications for two different qualities of aluminum metal covered paper, and such testimony, in my opinion, does not meet the requirements of proving dissimilarity of the imported merchandise with the aluminum metal covered paper sold for home consumption.

It is therefore my judgment, and I so hold on the basis of the record before me, that the imported aluminum metal covered paper in question is not dissimilar to the comparable commodity sold or offered for sale for home consumption in the German market at the time of exportation of the instant merchandise.

Considering now the second claim of plaintiff, to wit, that the foreign market for aluminum metal covered paper such as or similar to the paper in question was a controlled market at the time of exporta-

tion of the instant merchandise, I find that the proof offered on that point consists of three affidavits.

One affidavit, exhibit 21 herein, was executed by Doctor Rudolf Gornandt, who stated that from January 1, 1934, to the time he signed said affidavit, March 28, 1940, he was managing director of the Aluminum Foil Association and the Convention for Aluminum Covered Paper, two organizations or cartels composed of *all the manufacturers* of aluminum foil and aluminum metal covered paper in Germany. Concerning aluminum metal covered paper, which is the only class of merchandise involved in this appeal for reappraisement, said witness testified that, during said period, in his capacity as managing director he managed all the affairs of said Convention for Aluminum Covered Paper, whose purpose was to control and direct the entire disposition of aluminum metal covered paper from the time of manufacture to its consumption in Germany; that to effect such purpose said cartel fixed the prices at which such paper was sold for home consumption in Germany by its members to wholesalers and consumers; that in many instances where sales of such paper were made at prices lower than those fixed by the said cartel a penalty of one reichsmark per kilogram was exacted of the seller; that the sales by said members were restricted to certain individuals, partnerships, corporations, and other concerns, set forth on a list published by the said Convention for Aluminum Covered Paper; that sales by members of said cartel to such approved wholesalers were made with the stipulation that such paper could be sold to consumers, approved by the said organization, at the prices fixed by said cartel; and that sales to the approved consumers by members of the organization as well as sales by said wholesalers to the approved consumers, could be made only with the agreement that the latter would use the merchandise in their plants and not resell it; and that a penalty was imposed upon the members of said cartel in many instances during the period testified to by the witness for violation of the restrictions applied by said organization over the sale of aluminum metal covered paper in the foreign market.

The two other affidavits offered by plaintiff to show a controlled foreign market were executed by the sales manager of the exporter of the merchandise in question, and were admitted in evidence as exhibits 22 and 27. Said witness testified that during the period with which we are concerned for the purposes of this case he had charge of all sales of aluminum metal covered paper produced and sold by the said exporter for consumption in Germany; and that during said period his firm was a member of the "Association for Aluminum Metal Covered Paper," which embraced as its members all manufacturers of aluminum metal covered paper in Germany. The testimony of said witness in said affidavits corroborates the statements contained in the affidavit of the managing director of the Convention for Alu-

minum Covered Paper, exhibit 21, hereinabove referred to, so far as the control and restrictions maintained by said cartel are concerned with respect to the sale of aluminum metal covered paper for consumption in Germany to wholesalers and consumers. Said witness further testified in his affidvait, exhibit 27, that the business of the exporter of the instant merchandise, so far as offering for sale and selling aluminum metal covered paper for home consumption in Germany is concerned, is representative of the dealings in such paper in the usual course of trade by all other concerns in Germany.

In my judgment the uncontradicted evidence offered by plaintiff establishes that aluminum metal covered paper, such as or similar to the merchandise in question, was not freely offered for sale for home consumption in the foreign market, at the time of exportation of the instant merchandise. That the control exercised by the said Convention of Aluminum Covered Paper "did not include all of the possible purchasers of aluminum metal covered paper in Germany," as testified to by the managing director of said cartel, does not affect the conclusion that the foreign market was a controlled one. *Goodyear Tire & Rubber Co.* v. *United States* (11 Ct. Cust. Appls. 351, T. D. 39158). The said Convention of Aluminum Covered Paper embraces *all of the manufacturers* of aluminum metal covered paper in Germany. Hence, control over such paper is established at the source. The restrictions imposed on the manufacturers in their sale to certain approved wholesalers and consumers, with the stipulation included in sales to the latter compelling them to use the product in their plants, carried the control by said cartel to the distribution and use of such paper. And finally, the exaction of penalties where any violation of the rules and regulations of said cartel was found, rendered absolute and complete, in my opinion, the control exercised in Germany over production, sale distribution, and use of said paper by the said Convention of Aluminum Covered Paper.

One of the reasons why export value cannot be used as the basis for appraisement of the instant merchandise, assigned by counsel for defendant in his brief, is the existence of an exclusive selling agency agreement, exhibit 1 herein, between a concern in this country and the foreign exporter, and in support of such contention said counsel cites the case of *United States* v. *Massce & Co.*, etc. (21 C. C. P. A. 54, T. D. 46379).

Under the terms of the said agreement, Adolphe Hurst & Co., Inc., of New York City, acquired the sole representation or sole selling rights on aluminum metal covered paper manufactured by The Breisgau-Walzerk, G. m. b. H., the exporter of the paper covered by this appeal to reappraisement. In fixing the relationship between the parties thereto, said agreement mentions two classes of transactions: First, those where the agent in this country buys for its own account or

sells on its own account to importers here; and, second, those where the agent acts purely on a commission basis. In cases where the agent buys for itself or sells on its own account, it assumes the entire credit risk and is allowed a 5 per centum discount deductible from the respective invoices, while responsibility for good delivery of the merchandise lies entirely with the foreign principal. In transactions where the agent is acting on a commission basis, the German manufacturer and exporter determines whether the order shall be accepted, and allows the agent a 5 per centum commission, payable quarterly on the basis of paid-up transactions, on the sales prices obtained for the merchandise sold by the agent in this country. Invoices covering such transactions are made payable to the agent who is required to make monthly accountings and remittances to its foreign principal. It is entirely within the discretion of the latter to determine under what conditions of the agreement the agent has consummated any particular transaction. Prices for such paper emanate from the foreign manufacturer and exporter who is required to submit the lowest prices and best terms, and at the same time communicate the correct home market prices. It is also provided that the said Breisgau-Walzwerk G. m. b. H. may do business directly with any importer in this country, subject to the commission arrangement with the agent, as set forth in said agreement.

The oral testimony of the two witnesses introduced by plaintiff explained the application of the agreement referred to, said exhibit 1. The combined testimony of the vice president of said Adolphe Hurst & Co., Inc., and the president of the corporation that imported the merchandise in question, shows that the said exclusive selling agent freely offered to all purchasers in this country aluminum metal covered paper, such as or similar to that involved herein; and that purchases were actually made by said agent both for its account and on a commission basis for other importers under the provisions of the said agreement, exhibit 1. It further appears from the testimony that, in executing such sales, the said agent forwarded to the foreign manufacturer the purchase order of the importer, as well as one of his own concern; that the manufacturer returned to said agent a confirmation of the order received; and that the agent sent such confirmation to the purchaser in this country. Such procedure was generally followed by the agent in all its dealings with the foreign manufacturer, and is the method used in completing the transaction that resulted in the importation in question. The record further shows that some sales of aluminum metal covered paper, such as or similar to that involved herein, were made direct by the foreign manufacturer to different importers here. In support of said witnesses' testimony there was produced and admitted in evidence (exhibits 2 to 13, inclusive, and collective exhibit 20), copies of orders, confirma-

tions, and invoices covering sales of imported merchandise, such as or similar to that involved herein.

The *Massce* case, *supra*, is clearly distinguishable from the present one. In the cited case the American selling agency was owned and controlled by the foreign manufacturer, and all offers for sale and sales were made in the United States, and none in the foreign market. In the instant case it is established of record that the foreign manufacturer, properly within the terms of the agreement, said exhibit 1, sold aluminum metal covered paper, such as or similar to that in question, directly to importers here; and that in those cases where the agent acted in his legally authorized capacity final acceptance of the order and assumption of the credit risk rested entirely with the foreign exporter.

The facts before me, so far as they relate to the question raised by the said American exclusive selling agency, are substantially the same as those which were before the court in the case of *Robinson & Co. et al.* v. *United States* (13 Ct. Cust. Appls. 644, T. D. 41486), and I therefore follow the ruling of our appellate court in that case and hold that the contract of agency, said exhibit 1, is no bar to finding export value, as such value is defined in section 402 (d) of the Tariff Act of 1930, and which I hold to be proper basis for appraisement of the instant merchandise.

Thus the question is presented whether plaintiff has established by the proof adduced herein all of the elements necessary to meet the statutory meaning of said export value. The evidence along that line consists of three affidavits which were admitted in evidence as exhibits 24, 25, and 26, and all of which were executed by the assistant export manager of the manufacturer and shipper of the instant merchandise. Referring to the period with which we are concerned for the purposes of this case, said witness testified that he had charge of all of the aluminum metal covered paper manufactured by the said Breisgau-Walzwerk G. m. b. H. and sold for export to the United States, including the sale of the merchandise covered by the importation in question; that the relationship in all such transactions between the purchasers in this country and the foreign manufacturer was that of buyer and seller; and that the business of exporting such paper as conducted by said company is representative of that carried on by other concerns in Germany. Said witness further testified that merchandise, such as or similar to the paper in question, was at the time of exportation of the instant merchandise freely offered for sale in the ordinary course of trade to all purchasers in the principal market of Singen-Hohentwiel, Germany, and in the usual wholesale quantities of 5 to 50 reams, at prices that were not generally higher than those set forth in the consular invoice. Invoices covering the sales listed

in the affidavits, said exhibits 24 and 25, which referred to the merchandise in question, fairly support the testimony of said witness.

Such evidence is uncontradicted in the record before me, and, in my judgment, is sufficient to warrant the conclusion that the entered values represent the proper dutiable export value of the merchandise in question, and I so hold.

The motion of counsel for defendant to dismiss this appeal to reappraisement is denied, and the objections of said counsel to plaintiff's exhibits 21 to 27, inclusive, are overruled. Exceptions to said rulings are allowed said counsel.

On the basis of the record before me I find the following facts:

(1) That the merchandise in question consists of certain qualities of aluminum metal covered paper imported from Germany.

(2) That said merchandise is similar to paper that was offered for sale in the German market for home consumption, at the time of exportation of the instant merchandise.

(3) That the foreign market, at the time of exportation of the instant merchandise, for such or similar merchandise was a controlled market.

(4) That there was no foreign-market value, as such value is defined in section 402 (c) of the Tariff Act of 1930, for the instant merchandise at the time of exportation thereof.

(5) That the proper basis of appraisement for said merchandise is export value, as such value is defined in section 402 (d) of the said act.

(6) That such dutiable export values of the qualities of aluminum metal covered paper in question are the entered values.

I hold as matter of law that the correct dutiable values of the instant merchandise are the export values as set forth in fact (6). Judgment will be rendered accordingly.