NICHOLAS GAL (GLOBE SHIPPING CO., INC.) *v.* UNITED STATES

No. 8119.—

Entry Nos. 720153/1; 708931; 859096/2.

dated May 26, 1952)

*Eugene R. Pickrell* (*Michael Stramiello, Jr.,* and *Eugene R. Pickrell*) for the plaintiff.

*Charles J. Wagner,* Acting Assistant Attorney General (*Samuel D. Spector,* special attorney), for the defendant.

RAO, Judge: Various importations of aluminum metal covered paper were entered on behalf of the plaintiff at values which were stated to represent the export values of said merchandise. In the cases of reappraisement 139494–A and reappraisement 139535–A, the merchandise was appraised on the basis of foreign value, while cost of production formed the basis of appraisement of the merchandise covered by reappraisement 140802–A. In each instance, the appraised values constituted advances over the entered values, and an appeal for reappraisement was filed. The three appeals thus resulting were consolidated for the purposes of trial.

At the trial, it was conceded by the defendant that the appraised values in reappraisements 139494–A and 139535–A were erroneous, and that there were, in fact, no foreign values for the involved merchandise. Plaintiff likewise endeavored to repudiate his entered values, and sought to establish United States values for the merchandise at bar. In this connection, three witnesses were called to testify on behalf of the plaintiff and three exhibits were introduced in evidence. No testimony, oral or documentary, was offered by the defendant.

Plaintiff's exhibit 1 consists of a ledger containing records of sales of aluminum covered paper, together with records of payments for invoices issued. Plaintiff's exhibit 2 is a tabulation of information contained in plaintiff's exhibit 1, as well as information concerning profits, general expenses and insurance, about which plaintiff testified at the trial, and the computation of the resulting figures into an alleged United States value for each imported item. Plaintiff's exhibit 3 consists of an agreement in German between Nicholas Gal and Aluminiumwerk Tscheulin G. m. b. H. (hereinafter called Tscheulin), dated April 15, 1937, with a true translation thereof into English.

Plaintiff, Nicholas Gal, testified that from 1933 or 1934 to the end of 1939, he was engaged in the business of selling in the United States aluminum metal covered paper imported from Germany. He stated that during the period covered by the instant importations, he actually had in stock merchandise such as or similar to that at bar, which he had previously imported from Germany; that he freely offered such merchandise for sale in the United States to all who desired to purchase it, there being no restrictions whatsoever attached to such sales;

that delivery usually was made between 3 to 8 weeks, and sometimes longer, after the order was taken; that New York City was the principal market in the United States for the sale of such or similar merchandise; that there was no fluctuation in price during the period in question, nor did the prices vary by reason of the wholesale quantities sold; and that his prices included the packing.

This witness stated further that he did not make any profit from the sale of merchandise such as or similar to that in issue; that this was an unusual circumstance but explainable by the fact that by virtue of his importations of aluminum metal covered paper from Germany, he was authorized to export cotton and copper to Germany, on which transactions his profit was realized. He also stated that his usual general expenses for the involved period, covering salaries, drawings, telephone and cable charges, traveling expenses, brokers' fees, warehouse and freight charges, cost of entertainment of customers, and miscellaneous expenses averaged about 4 per centum of an annual volume of business of over $300,000, or approximately $13,000 to $14,000 per year, and that sea insurance cost one-half of 1 per centum of the invoice value of his importations.

On cross-examination, witness Gal testified that as of February 6, 1937, his relationship with the foreign manufacturer changed, and that as the result of an agreement between himself and the manufacturer (plaintiff's exhibit 3), he thereafter became a purchaser of the manufacturer's merchandise, with exclusive rights to buy all aluminum metal covered paper manufactured by that concern. When he received an order for aluminum metal covered paper, he either sent it on to the factory in Germany, or filled it from such or similar previously imported merchandise which he had in stock.

At a subsequent hearing, plaintiff, Nicholas Gal, testified that during the period in which he was in the aluminum metal covered paper business, he became familiar with the various kinds of such paper which were manufactured in Germany and exported to the United States, by observing the manufacturing process of the Tscheulin factory, and by approaching the users of such merchandise produced by other German manufacturers. He obtained samples of the materials purchased from other German sources, and had them analyzed physically and chemically. He also discussed with his customers the problems resulting from the use of aluminum metal covered paper obtained from competitive sources. He collaborated with a technical staff from his factory in the development of a type of paper which to a large extent solved the problems the users had been experiencing with this paper.

In the opinion of this witness, the aluminum metal covered paper manufactured by Tscheulin differed in many respects from that manufactured by other German concerns. It appears from the testi-

mony of this witness that metal covered paper is a combination of aluminum foil and paper, the aluminum foil being mounted on the paper by an adhesive; and that differences existed in the foil, in the adhesive, and in the paper itself. Aluminum foil, according to this witness, is a combination of scrap aluminum and virgin aluminum. In making its aluminum foil, Tscheulin used about 70 per centum scrap and 30 per centum virgin aluminum. Without being able to give the precise proportions used by other manufacturers, Gal, nevertheless, stated that the factory used much more virgin aluminum and much less scrap than Tscheulin; and that the combination used by Tscheulin resulted in a much softer foil. He also stated that Tscheulin used lighter and softer paper, in many instances, cellulose, where competitors used bond paper; that the adhesive used by Tscheulin eliminated certain acids which the other adhesives contained, thus avoiding corrosion caused by the humid climate here; that Tscheulin's foil was rolled to the lower end of the plus-minus 10 per centum tolerance always added for the thickness of the foil; and that it did not eliminate all the lubricating oils used in the manufacture and rolling out of the foil, all of which processes resulted in a much more pliable and satisfactory foil from the standpoint of operation on the machines. By virtue of the use of a greater percentage of scrap aluminum, the rolling of the foil to the lower end of the tolerance, and more efficient production methods, Tscheulin's product was lower in price, in most instances, than the competitive products. It also served its users, who are box makers and, to a certain extent, seal and label manufacturers, more efficiently as it did not tear or break as readily. It was of a better tensile strength than competitive foil, and eliminated unreasonable waste.

Plaintiff concluded his direct examination by stating that Tscheulin's products were not commercially interchangeable with those of other German manufacturers and that delivery of the latter would not have been a satisfactory delivery for the former.

On cross-examination, plaintiff testified that while his competitors solicited the same trade that he did, they were not successful; that there were two or three other German firms manufacturing aluminum metal covered paper, but that he met their competition "very, very little"; that those whom he sold did not buy from his competitors and their customers did not buy from him; that this paper was used to manufacture boxes in combination of some supporting material on which the aluminum foil was mounted; that his tests showed the process of manufacture of the competitive German firms was different, the difference being important enough to result in a very great difference in the operation of the material and also a difference in the cost; that competitive papers probably cost more to produce, or their profits were larger, or both, as they sold for more; that the

others used both cellulose and bond papers; that his factory also used cellulose and bond paper, although it called the latter edelweiss paper, which was a special paper made for his factory; that edelweiss paper is a softer and more pliable paper, but is a rag content paper as is bond paper; that the paper was purchased by weight, such as 60-gram cellulose, 50-gram cellulose; that his competitors sold a 60-gram cellulose paper "not exactly the same type of paper," but not a 50-gram cellulose paper; they also sold a 10-millimeter paper, but not a 9-millimeter paper; that the product made by his competitors was sold to the same class of users—seal makers and box manufacturers—as his paper; that he would say as a salesman that his product was a better product than that of his competitors; that the competitors' paper looked similar but did not perform similarly; that his customers "had fast moving machines and such operations where adjustment was such that it worked exactly with our paper and foil"; and that his competitors were not interested in selling customers with fast-moving machines.

Mrs. Jennie Nelkin testified that as an employee of Nicholas Gal for 9 or 10 years she did general office work, taking care of the books, answering telephones, sending cables, and acting as a stenographer. It was she who made the entries in plaintiff's exhibit 1. She also made out invoices for sales in this country. She stated that invoices were made at the time of delivery which was usually several weeks after the orders were taken. Mrs. Nelkin agreed with plaintiff as to the items entering into the calculation of the general expenses of the business, which to her recollection averaged about $14,000 a year.

Michael Stramiello, Jr., testified that at the request of plaintiff he made a tabulation from plaintiff's exhibit 1, from the entries, and from additional information supplied by Mr. Gal, which additional information coincided with Mr. Gal's testimony at this trial, and calculated therefrom United States value of the imported merchandise pursuant to the formula set forth in section 402 (e) of the Tariff Act of 1930 for said value. This tabulation was received in evidence as plaintiff's exhibit 2. The court questioned the witness as to the source of the information supplied under the various headings in plaintiff's exhibit 2 and ascertained that the description of the merchandise and the quantity thereof were obtained from the invoices; the entered and appraised values were found in the entry papers; the statement as to the purchasers, the dates of offers or sales, and the prices were items taken from plaintiff's exhibit 1, supplemented by Mr. Gal's testimony; that the items referring to the lapse of time between offers of sale and delivery, profit, general expenses, and insurance were items derived from information supplied by Mr. Gal, corroborated by his testimony at the trial; ad valorem and spe-

cific duties were as prescribed in the statute and included in the entry papers; and the item of sea freight was taken from the entry papers. Mr. Stramiello then stated that he added the items which are marked "Profits and General Expenses" and "Ad Valorem Duty," "Specific Duty," "Sea Freight Insurance," and whatever other deductions are permitted by statute and are listed on plaintiff's exhibit 2, and deducted that total from the price at which such or similar merchandise was offered for sale to arrive at United States value.

On the basis of this record, plaintiff contends that there was neither a foreign nor an export value for the merchandise at bar, and that United States value, as defined in section 402 (e) of the Tariff Act of 1930, should be computed in determining the proper values of these importations. Export value is disclaimed by plaintiff on the theory that at the time of exportation of each of the involved shipments neither such nor similar merchandise was freely offered for sale for exportation to the United States. Particular emphasis is laid upon the alleged dissimilarity between Tscheulin's aluminum metal covered paper, and that of other German manufacturers.

The defendant relies principally upon the contention that the record does not establish dissimilarity. It is also asserted that United States value was not proven, because of the failure to include in the selling price, the profit made by plaintiff upon the barter exportations of cotton and copper.

The pertinent provisions of the value section of the Tariff Act of 1930 read as follows:

SEC. 402. VALUE.

(a) BASIS.—For the purposes of this Act the value of imported merchandise shall be—

(1) The foreign value or the export value, whichever is higher;

(2) If the appraiser determines that neither the foreign value nor the export value can be satisfactorily ascertained, then the United States value;

\*       \*       \*       \*       \*       \*       \*

(d) EXPORT VALUE.—The export value of imported merchandise shall be the market value or the price, at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

(e) UNITED STATES VALUE.—The United States value of imported merchandise shall be the price at which such or similar imported merchandise is freely offered for sale, packed ready for delivery, in the principal market of the United States to all purchasers, at the time of exportation of the imported merchandise, in the usual wholesale quantities and in the ordinary course of trade, with allowance made for duty, cost of transportation and insurance, and other necessary

expenses from the place of shipment to the place of delivery, a commission not exceeding 6 per centum, if any has been paid or contracted to be paid on goods secured otherwise than by purchase, or profits not to exceed 8 per centum and a reasonable allowance for general expenses, not to exceed 8 per centum on purchased goods.

Accordingly, before a United States value, as defined by section 402 (e), *supra*, may be found for imported merchandise, it must be established that there is neither a foreign nor an export value therefor; and the burden of proving the absence of such values rests with the party seeking a reappraisement of the importation. 28 U. S. C. § 2633; *Garbey* v. *United States*, 24 C. C. P. A. (Customs) 48, T. D. 48332; *United States* v. *T. D. Downing Co.*, 20 C. C. P. A. (Customs) 251, T. D. 46057; *United States* v. *Malhame & Co.*, 19 C. C. P. A. (Customs) 164, T. D. 45276.

The merchandise involved in reappraisements 139494–A and 139535–A, having been appraised on the basis of foreign value, and the defendant having conceded that there were no foreign values, the presumption of correctness which attaches to the appraisements by virtue of section 2633, *supra*, has been destroyed. Nevertheless, the plaintiff is required to prove the correctness of the values claimed by him. In this case, as he claims that United States value is the proper value of the instant merchandise, he must establish the nonexistence of export values for such or similar merchandise.

By the terms of the agreement concluded between Nicholas Gal and the foreign manufacturer, plaintiff's exhibit 3, Gal received the exclusive right to purchase such merchandise from the exporter. It therefore follows that *such* merchandise was not "freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States." *United States* v. *Malhame & Co.*, 24 C. C. P. A. (Customs) 448, T. D. 48911.

On the question of whether *similar* merchandise was so freely offered for exportation to the United States, plaintiff's proof is extensive but not convincing. The question of what constitutes similar merchandise is in the final analysis one which rests entirely upon the facts elicited in any given case. Nevertheless, there are certain guiding principles which serve to aid in the ultimate determination of this issue.

In the case of *United States* v. *Irving Massin & Bros.*, 16 Ct. Cust. Appls. 19, T. D. 42714, the court held:

In view of the common meaning of the word "similar" and of the authorities cited, we are of opinion, and so hold, that if goods are made of approximately the same materials, are commercially interchangeable, are adapted to substantially the same uses, and are so used, ordinarily, they are similar, within the meaning of section 402 (b). The importer or foreign manufacturer may not, by making a few changes in structure, or in giving the product a new name, or by restricting

its sale to the American purchaser only, *ipso facto* remove his merchandise from section 402 (b), the foreign value provision.

In *United States* v. *Wecker & Co.*, 16 Ct. Cust. Appls. 220, T. D. 42837, the following expression is found:

\* \* \* The question of similarity is, in each case, to be measured by much the same homely rule that applies to the prospective customer who enters a store seeking some utilitarian article of a certain specified name and style; he finds the article requested is not in stock but that another article, of approximately the same price and which will perform the same functions, is capable of the same use and may be substituted therefor, is available. Such an article is a similar article, notwithstanding the price, the methods of construction, and the component materials may be somewhat different; but, for all utilitarian purposes, one is a substitute for the other. It is in this sense, we believe, that the word similar was used in said section 402 (b).

Despite the protestations of the plaintiff to the effect that there were substantial differences in quality and price between the aluminum metal covered paper which he offered for sale, and that sold by other German manufacturers, and that the two types of paper were not commercially interchangeable, I am of opinion that it is fairly inferable from the record taken as a whole that a prospective purchaser, finding the Tscheulin products unavailable, would accept those of other German manufacturers as satisfactory substitutes, since they were adaptable to the same ultimate uses and would accomplish substantially the same results. It would appear that a manufacturer of aluminum metal covered paper boxes or of aluminum seals could produce those articles whether he used the Tscheulin aluminum metal covered paper or some other. It might, perhaps, be a less efficient process if the Tscheulin paper were unavailable, but it does not appear from this record that the use of other aluminum metal covered paper would produce an inferior box or seal.

Differences in the grade of aluminum used, in the production of aluminum metal covered paper, in the weight and thickness of the final product, in its softness, brittleness, tensile strength, cost of production, and its adaptability for machines of various speeds were held, in the cases of *Hensel, Bruckmann & Lorbacher, Inc.* v. *United States*, 6 Cust. Ct. 746, Reap. Dec. 5097, affirmed in *United States* v. *Hensel, Bruckmann & Lorbacher, Inc.*, 7 Cust. Ct. 355, Reap. Dec. 5329, and *United States* v. *Nicholas Gal et al.*, 15 Cust. Ct. 395, Reap. Dec. 6192, insufficient to establish dissimilarity of aluminum metal covered paper offered for sale for foreign consumption and that available for exportation to the United States, in the absence of proof as to "similarity of use or adaptability to use of both kinds of paper." The omission of proof of use in the cited cases, which has been here supplied, is of doubtful benefit to the plaintiff herein, as it has been established that the same general class of users, namely, paper box manufacturers and seal manufacturers, purchases com-

petitive aluminum metal covered papers as purchase the imported products.

Accordingly, I am of opinion that merchandise similar to that involved in reappraisements 139494–A and 139535–A was offered in Germany for exportation to the United States. As to whether it was freely offered for sale in compliance with the provisions of section 402 (d), *supra*, and the prices of such offerings, the record is silent. Under the provisions of 28 U. S. C. § 2631, I am required to find values for the imported merchandise. As the appraised values have been admitted to be erroneous, and there is insufficient evidence of record from which a finding of export values can be made, the issue of similarity having been resolved against the plaintiff, I hereby direct that the said two appeals be severed from reappraisement 140802–A and restored to the calendar for further proof in accordance with the views hereinbefore expressed.

With respect to the third appeal in this consolidated action, reappraisement 140802–A, the fact of an appraisement of the involved merchandise on the basis of cost of production raises entirely different considerations than those obtaining in reappraisements 139494–A and 139535–A. Inherent in that appraisement, there is a presumption that the appraiser has found the nonexistence of foreign, export, and United States values. As one who challenges the correctness of the appraised values may do so in respect of any of the items entering into the true value of the merchandise as represented by the appraisement, while relying upon the presumption of correctness which attaches to all the other items, plaintiff may prove a United States value without assuming any burden of negativing export value. *United States* v. *Freedman & Slater, Inc. (Household Utilities Mfg. Corp.)*, 25 C. C. P. A. (Customs) 112, T. D. 49241; *United States* v. *Fritzsche Bros., Inc.*, 35 C. C. P. A. (Customs) 60, C. A. D. 371. On this issue, plaintiff has sustained his burden. The proof shows the price at which such or similar previously imported merchandise was freely offered for sale for domestic consumption in the principal market of the United States to all purchasers at the time of exportation of the imported merchandise, in the usual wholesale quantities and in the ordinary course of trade with the allowances provided for in section 402 (e) of the Tariff Act of 1930, *supra*. In this connection, I accept as accurate the figures appearing in plaintiff's exhibit 2, which read as follows:

| | |
|---|---|
| Description of mdse_____ | .0095/105 mm white, plain bright, backed with glaseine paper, reels 3¾″ wide |
| Quantity_____ | 7712.035 pounds |
| Entered value_____ | RM .7409 per lb. ($.2988 per lb) |
| Appraised value_____ | RM 2.44 per Kilo ($.4464 per lb) |

Such or similar mdse.
offered or sold to_____ American Chicle Co.

Date of offer or sale_____ 5/3/38

Price at which offered or
sold_____ $.34 per pound

Profits & gen. exp_____ . 0136

Ad val duty_____ $.051

Specif. duty_____ $.05

Sea freight_____ .007

Ins._____ .017

Total deductions_____ $.1386

U. S. value_____ $.2014

Counsel for the Government urges that the proof of United States value herein is insufficient because the importer did not deduct any sum for profit. It is argued that the profit realized on the cotton and copper exported under the barter arrangement as an essential part of the transaction should have been added to the selling price, and an amount not exceeding 8 per centum should have been deducted therefrom as profit, pursuant to the provisions of section 402 (e), *supra*. A similar argument was disposed of contrary to the defendant's position in the case of *International Forwarding Co., Inc.* v. *United States*, 4 Cust. Ct. 836, Reap. Dec. 4898, wherein it was stated:

A careful reading of section 402 (e) clearly indicates that the maximum allowance of 8 per centum for profit refers only to profit made upon such or similar imported merchandise which in the instant case consists of paper tubes imported from Germany and sold in the United States. It is conceded that in the importation and sale of said paper tubes in the United States no profit was realized. In my opinion the fact that the importer by selling cotton and copper in the German market made a profit of from 25 to 35 per centum, the proceeds of such sale being deposited in a German bank and a portion thereof used in the purchase of the said paper tubes, is entirely irrelevant to the issue herein.

I, therefore, find, with respect to reappraisement 140802–A:

1. The merchandise covered by this appeal for reappraisement consists of aluminum metal covered paper exported from Germany in May 1938.

2. At the time of exportation thereof such or similar merchandise was not freely offered for sale for home consumption in Germany.

3. At the time of the exportation thereof such or similar merchandise was not freely offered for sale for export to the United States.

4. At the time of the exportation thereof such or similar merchandise was freely offered for sale for domestic consumption, packed ready for delivery, in the principal market of the United States to all purchasers, in the ordinary course of trade at the following price, and the following charges were incurred which, deducted from said price, result in the United States value shown below.

| | |
|---|---|
| Description | .0095/105 mm |
| Price | $.34 per pound |
| Profits and General Expenses | $.0136 |
| Ad valorem duty | $.051 |
| Specific duty | $.05 |
| Sea freight | $.007 |
| Insurance | $.017 |
| United States value | $.2014 per pound |

5. There was no variation in the price at which such or similar merchandise was offered for sale for domestic consumption in the United States as a result of the quantities sold.

I, therefore, conclude, with respect to reappraisement 140802–A, that:

1. At the time of the exportation of the merchandise at bar there · was no foreign or export value therefor, as those values are respectively defined by the provisions of section 402 (c) and (d) of the Tariff Act of 1930.

2. At the time of the exportation thereof, there was a United States value for merchandise such as or similar to that covered by the instant appeal for reappraisement, and said United States value was the value set forth in finding of fact numbered 4 above under the heading "United States Value."

Order and judgment will be entered accordingly.