(R.D. 11206)

CHICAGO BIRD & CAGE CO.
KEER MAURER & CO. } *v.* UNITED STATES

Entry No. 12070, etc.

(Decided July 13, 1966)

*Wallace & Schwartz* (*Joseph Schwartz* and *Barnes, Richardson & Colburn* of counsel) for the plaintiffs.

*John W. Douglas*, Assistant Attorney General (*Richard J. Kaplan* and *Samuel D. Spector*, trial attorneys), for the defendant.

RAO, Chief Judge: In the case of *Chicago Bird & Cage Co.* v. *United States*, 51 Cust. Ct. 456, Reap. Dec. 10625, it was held that the proper statutory basis of value to be employed in determining the values of certain birdcages exported from Germany during the year 1957 was cost of production, as defined in section 402(f) of the Tariff Act of 1930, and that such values were the substantial equivalents of the entered values.

The question of the proper basis of value for German birdcages is again in issue in the present proceeding wherein 22 appeals for reappraisement have been consolidated for purposes of trial. Here, as in the decided case, the merchandise was appraised on the basis of United States value, as defined in section 402(e) of said tariff act, as amended by the Customs Administrative Act of 1938, at unit values higher than the entered values, but cost of production was and is claimed to be the proper basis of value for said merchandise. As will be developed, *infra*, although it has not been expressly so conceded, apparently the appraised value represents the United States value of similar merchandise.

The statutory definitions here involved read as follows:

Section 402(e) of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938—

(e) UNITED STATES VALUE.—The United States value of imported merchandise shall be the price at which such or similar imported merchandise is freely offered for sale for domestic consumption, packed ready for delivery, in the principal market of the United States to all purchasers, at the time of exportation of the imported merchandise, in the usual wholesale quantities and in the ordinary course of trade, with allowance made for duty, cost of transportation and insurance, and other necessary expenses from the place of shipment to the place of delivery, a commission not exceeding 6 per centum, if any has been paid or contracted to be paid on goods secured otherwise than by purchase, or profits not to exceed 8 per centum and a reasonable allowance for general expenses, not to exceed 8 per centum on purchased goods.

Section 402(f) of said act, *supra*—

(f) COST OF PRODUCTION.—For the purpose of this title the cost of production of imported merchandise shall be the sum of—

(1) The cost of materials of, and of fabrication, manipulation, or other process employed in manufacturing or producing such or similar merchandise, at a time preceding the date of exportation of the particular merchandise under consideration which would ordinarily permit the manufacture or production of

the particular merchandise under consideration in the usual course of business;

(2) The usual general expenses (not less than 10 per centum of such cost) in the case of such or similar merchandise;

(3) The cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the particular merchandise under consideration in condition, packed ready for shipment to the United States; and

(4) An addition for profit (not less than 8 per centum of the sum of the amounts found under paragraphs (1) and (2) of this subdivision) equal to the profit which ordinarily is added, in the case of merchandise of the same general character as the particular merchandise under consideration, by manufacturers or producers in the country of manufacture or production who are engaged in the production or manufacture of merchandise of the same class or kind.

The record in the decided case has been incorporated into the instant record, the parties having agreed that the merchandise, the issues, and the facts in the present case are the same in all material respects as those in the incorporated case. Although the witnesses whose testimony was elicited in the prior case were recalled for further cross-examination, and the defendant has now introduced the testimony of one witness and several pricelists have been received in evidence in its behalf, the record which the court must presently consider is essentially the same as that previously submitted, except that the parties have also stipulated that, if cost of production is found to be the proper basis of value, then the values so computed are equal to the entered values. Also, the consolidated cases here involved cover the period of time between 1955 and 1957, but apparently market conditions abroad and here did not vary during that time, and no issue arises in the present action by reason of this circumstance.

It is not disputed and, indeed, it may be presumed from the appraiser's finding of United States value that there was no foreign or export value for the merchandise covered by these appeals for reappraisement. Since the appraisement is clothed with a statutory presumption of correctness (28 U.S.C. § 2633), implicit in which is the finding of every fact essential to support the conclusion reached, and since, by the provisions of section 402(a) of the Tariff Act of 1930,[1] United States value may not be invoked unless there was no foreign or

---

[1] (a) BASIS.—For the purposes of this Act the value of imported merchandise shall be—

(1) The foreign value or the export value, whichever is higher;

(2) If the appraiser determines that neither the foreign value nor the export value can be satisfactorily ascertained, then the United States value;

(3) If the appraiser determines that neither the foreign value, the export value, nor the United States value can be satisfactorily ascertained, then the cost of production;

\*         \*         \*         \*         \*         \*         \*

export value, the appraisements in the present instance contemplate the absence of those alternative bases of value. A party challenging an appraisement may rely upon all presumptively correct facts not inconsistent therewith or with the challenge. *United States* v. *A. N. Deringer, Inc.*, 46 Cust. Ct. 762, A.R.D. 127; *Nicholas Gal (Globe Shipping Co., Inc.)* v. *United States*, 28 Cust. Ct. 656, Reap. Dec. 8119, affirmed 32 Cust. Ct. 657, A.R.D. 39, appeal dismissed June 18, 1954; *United States* v. *Fritzsche Bros., Inc.*, 35 CCPA 60, C.A.D. 371; *United States* v. *Supreme Merchandise Company*, 48 Cust. Ct. 714, A.R.D. 145.

It appears from the original record, in particular from the testimony of Mr. Sidney Meyers, a partner in the firm of Chicago Bird & Cage Co., the importer of the merchandise at bar (hereinafter referred to as the importer), that the said company is engaged in the business of selling live birds, birdcages, accessories for birds, and accessories for domestic type animals in general. Approximately 90 percent of its business is conducted through leased pet departments in department stores; that is to say, the importer operates the pet department in the store, ostensibly under the name of the store, but in reality in its own name and for its own account. Sales are made through these departments directly to consumers.

It further appears that under certain special circumstances sales of birdcages were also made to the mail-order houses known as Spiegel's and Montgomery Ward, to Kress' five- and ten-cent store, and to some carnival dealers who were permitted to purchase cages if they also bought birds.

Concerning sales to Spiegel's and Montgomery Ward, the witness testified that it was not his company's policy to sell to wholesalers nor did he ever solicit any, but that a representative of Spiegel's had sought his assistance for the preparation of the pet page of that company's mail-order catalog, and as a result, the importer sold some birds and some cages to Spiegel's. When Montgomery Ward saw what had been done for Spiegel's, it too requested help with its pet page and made some purchases of birds and cages.

Sales to Kress resulted from the witness' attempt to dispose of about 300 birdcages that were of a model the importer no longer desired and which were reordered several times at the request of the Kress store.

By reason of his familiarity with the pet accessory business, the witness stated that he believed that, during the year 1957, there were four other importers of birdcages. Three, to wit, Reliance Sales Co., Lou Hershey, and Acme Pet Supply, were located in New York, and one, whose name he believed was Al Mazer, was located on the west coast. He was familiar with the various retail outlets to which they sold and, by reason of normal competition, was both interested in and

aware of the quality and type of product which was distributed by them. In the opinion of this witness, a Reliance birdcage would weigh from a pound to a pound and a half more than his own, which would indicate that it was probably made of a heavier gauge steel.

Cross-examination of this witness at both the original trial and in the present record served to elaborate and particularize the statements which he had made on direct examination without in any way affecting the substance thereof, and it is clear therefrom that such merchandise, namely, the merchandise imported by Chicago Bird & Cage Co. during the period 1955 through 1957, was not freely offered for sale to all purchasers within the contemplation of the provisions of section 402 (e), *supra*, and that justification for a United States value, if it exists, must depend upon the evidence with respect to the sales practices of the importers of similar merchandise. As to that evidence, which will be hereinafter reviewed, it was held in the decided case that it established that similar merchandise was sold in the United States only to selected wholesalers who were restricted in their disposition of the merchandise, and that, under authority of *A. N. Deringer, Inc.* v. *United States*, 40 Cust. Ct. 810, Reap. Dec. 9145, there was no United States value for the importations in question. The court quoted the following excerpt from the *Deringer* case:

There is little room to doubt that the record as presently constituted, which has once again been carefully reviewed, supports the conclusions heretofore reached in this case, as to the nonexistence of foreign, export, or United States values for the merchandise at bar. It has been established, without any evidence to controvert it, that the manufacturer of the imported doors imposes restrictions upon all sales and offers for sale which reach out and restrain all purchasers, except the retail lumber dealer, in their further distribution of the manufacturer's product. It has also been established that the retail lumber dealer sells only to the ultimate consumer.

With the limitations upon full dominion which have been here shown to be in effect, there is a complete denial of the freedom of offer and open competition which underlie the statutory definitions of the three bases of value set forth respectively in subdivisions (c), (d), and (e) of section 402 of the Tariff Act of 1930. * * *

The evidence upon which the court concluded that sales in United States markets were restricted consisted of the testimony of Mervin A. Savitt, secretary-treasurer of Reliance International Manufacturing, Ltd., Louis Hershey, proprietor of his own firm known as the Hershey Company, and an affidavit of Alfred A. Mazer (plaintiffs' exhibit 2), who conducts business under his own name in the city of Los Alamitos, Calif. There was also in evidence in the decided case an affidavit of one Johann Hanke (plaintiffs' exhibit 1), partner and manager of the manufacturer of the merchandise at bar. Inasmuch

as the recitals contained in the affidavit relate to cost of production figures, the sum of which is here conceded, no further consideration need be given thereto. The incorporated record also contains a report (defendant's exhibit A) of an interview with Mr. L. Hershey concerning his importations of metal birdcages from Netra & Co., of Nürnberg, Germany, the manufacturer and exporter of the merchandise at bar.

According to the witness Savitt, Reliance International Manufacturing, Ltd. (hereinafter referred to as "Reliance"), was engaged in the pet supply and pet accessories business during the period here involved and for some years prior thereto. His company sold birdcages in 1957 to selected wholesalers in certain parts of the country who were granted exclusive rights for designated areas and to those chain stores only which operated 10 or more stores and were of the better class "like what we call major chain stores." It did not offer its birdcages to all wholesalers in the United States, but "being in a confined business like we are, and knowing all the wholesalers through the country, we selected the ones we felt were the best paying customers and what we thought was the largest and that we can get the most business from in that particular area." However, in the cities of New York and Chicago, the company sold to many jobbers or wholesalers who were more or less limited to their own localities by reason of freight differentials. It was not the policy of the company to sell to any retailer or any other wholesaler or jobber in an area in which it had previously established an exclusive wholesaler.

The testimony of this witness tended to be confused and confusing, and it was necessary for him to be recalled during the course of the first trial, especially to clarify certain of his statements with respect to the exclusive distributorships he had set up in California and his arrangements with wholesalers generally. Although he had testified that the two wholesalers who were given territories in California and who had agreed "voluntarily * * * because of my insistence" to relinquish any rights to sell in each other's territory, could resell at wholesale at any other place in the United States, he subsequently modified his testimony by saying that they would not be permitted to sell in any other area in which an exclusive representative operated.

The witness indicated that it was the general policy of his company to restrict resales by all of its wholesalers to the areas in which they were designated or to such other areas as had no exclusive wholesaler, and that all arrangements with his customers were the results of verbal contracts. To the best of his knowledge, they lived up to their agreements, and he believed that, since he traveled throughout the country quite often, he would know within 24 hours, through the complaint of one or another of his customers, if any wholesaler in-

vaded the territory of another. He was not at all clear on the question of whether or not a distributor was prohibited from selling in any district other than his own nor as to what reprisals his company would make in the event that one of the wholesalers did not comply with the restrictive agreement.

Further examination of this witness at the trial of the instant case scarcely served to clarify his explanation of his company's sales practices. Generally, however, he indicated that Reliance had "chosen" wholesalers in many parts of the country; that where a wholesaler had been selected to represent the company, Reliance would not make any sales to any other wholesaler in that area; and that when Reliance sold to wholesalers who were not exclusive representatives, they were advised orally "as best possible where we had exclusives."

The witness Hershey also testified that he did not offer the birdcages which he imported from Germany to all wholesalers. By reason of the size of his company and his inability to canvass the whole country, he restricted sales to selected wholesalers in the areas east of the Rocky Mountains and to certain chain stores. Mr. Hershey stated that he orally restricted his wholesalers to allotted areas and would not sell to anyone who did not abide by his agreement, but he never checked to find out whether his customers did or did not do so. It appears, moreover, from defendant's exhibit A, that when interviewed by Customs Agent Gerard C. Lundy, Mr. Hershey did not mention any limitations upon his customers, but, in fact, created the impression that "merchandise is sold only to dealers and jobbers without restrictions, however, no sales are made to the ultimate consumer."

The affidavit, introduced as plaintiffs' exhibit 2 in the incorporated case, contains a recital of the sales practices of the firm which the affiant, Alfred A. Mazer, conducts in his own name. It appears therefrom that sales of birdcages were made to selected wholesalers and to selected dealers (retailers) in various key spots in the States of California, Oregon, and Washington, and that these purchasers are restricted to reselling within their own designated geographical territories.

As hereinabove observed, Mr. Meyers, Mr. Savitt, and Mr. Hershey were recalled for additional cross-examination at the time of the instant trial, and their testimony in the main tended to elaborate the statements which they had made at the original trial.

In addition, the Government introduced the testimony of Mr. Arthur Rosenel who, during the period here involved, was president of Reliance. He testified that, during the years 1956 and 1957, most of his company's sales were made in New York primarily to chain stores whose buying offices were in New York. It also had a salesman who sold to dealers and wholesalers, and direct sales were made to dealers

and wholesalers in the New York area. In offering its merchandise for sale, Reliance used two separate pricelists, one for dealers whom the witness defined as retailers (the second sheet of defendant's exhibit AA), the other for wholesalers (the first sheet of said exhibit). This witness further stated that he would sell to any wholesaler or retailer in the metropolitan area who had a good credit rating, and while his company did not have any exclusive wholesaler in the metropolitan area, it did elsewhere. And although no explicit restrictions were imposed upon the New York wholesalers, it would not have been commercially practical for them to have sold in any other area.

No extended discussion need be made here concerning the similarity between the birdcages imported by Chicago Bird & Cage Co. and those imported and sold by Reliance, Hershey, and Mazer for the reason that the question of similarity has not been pressed in this case. Since, in view of the importer's restrictive sales policies, it may be assumed that appraisement was made on the basis of United States value of similar merchandise, it follows that the birdcages of one or another of the named importers is presumptively similar. While the record discloses that the birdcages sold by Reliance were of a better quality than the instant importer's, dissimilarity on that ground is not stressed, and despite the fact that the Hershey Company purchased the birdcages from the same German manufacturer as the importer, the inference is made that it was the Reliance product which the appraiser selected.

Seemingly, also, all of the evidence in the combined records tends to establish without question that none of the original importers freely offered his birdcages for sale to all purchasers at wholesale. So far as Chicago Bird & Cage Co. was concerned, it made no offers to any wholesalers in the regular course of trade.

Its sales to Montgomery Ward and Spiegel's resulted from the special circumstances outlined by the witness Meyers and were not representative of the company's usual business practices. In any event, it was not such merchandise which formed the basis of the appraiser's action. Nor did any of the other importers make it a practice to sell or offer to sell to all purchasers at wholesale. Each pursued a course of business which involved the sale of its birdcages to selected wholesalers in designated areas of the country and, to a certain extent, to selected chain stores only.

While it is true that, in the case of Reliance, sales were made to all wholesalers in the New York area who possessed a satisfactory credit rating and were otherwise unrestricted, the record, nevertheless, establishes that elsewhere in the country only certain wholesalers were permitted to buy. Under the rule enunciated by our appellate court in the case of *United States* v. *Heemsoth-Kerner Corp. (Bauer Type*

*Foundry, Inc.*), 31 CCPA 75, C.A.D. 252, such an arrangement precludes a finding that the merchandise sold by Reliance was freely offered for sale to all purchasers. The court therein stated:

So, while it appears that the merchandise is freely offered by appellee for sale in the principal market at list prices to all purchasers in some portions of the United States, it is not freely offered for sale by appellee at such list prices in such principal market to purchasers in territories allotted to distributors, which territories cover a major portion of the United States. Therefore, it may not be held that it is freely offered for sale in the principal market to all purchasers in the ordinary course of the trade within the meaning of section 402(e), *supra.* * * *

Were this all that was involved in this case, it would seem to require a holding consistent with that in the decided case that there was no United States value for such or similar merchandise. But, for reasons hereinafter discussed, I am constrained to find that the evidence is inadequate to negative United States value.

Notwithstanding the fact that sales to wholesalers were made on a selective basis by Reliance and Hershey, who seemingly endeavored to set up exclusive distributorships in restricted areas, the fact remains that wholesalers resold to retailers without apparent control over their operations by their respective suppliers. Although the witnesses testified that their restrictive arrangements were the results of verbal agreements, their testimony does not convince that the alleged contractual limitations were enforced or enforceable. What evidence there is on this phase of the case tends to show that restrictions on resale were not seriously policed, and there is an absence of proof as to what sanctions might have been invoked if the wholesalers sold outside the specified areas. In this respect, the instant case is distinguishable from the *Deringer* case, *supra,* wherein the evidence established without contradiction that "limitations relating to territory, class of purchaser and price, in fact, circumscribed all sales by wholesalers."

Sales by wholesalers to retailers are permissible sources upon which to predicate statutory value where sales at the manufacturer's level are restricted. *United States* v. *H. W. Robinson & Co., State Forwarding Co., and Edgar S. Bibas,* 19 CCPA 274, T.D. 45436; *Glanson Co.* v. *United States,* 31 Cust. Ct. 473, A.R.D. 33 (ultimately reversed on other grounds, *United States* v. *Glanson Co.,* 47 CCPA 110, C.A.D. 740).

As the writer of this opinion observed in A.R.D. 33, *supra*—

The proven fact is that the wholesale trade constituted one of the categories of purchasers to whom the manufacturer sold its wares. Whether that class of trade offered to sell cribbage boards at prices which would, consistent with the provisions of the foreign value

statute, enable the selection of a freely offered price to all purchasers for home consumption, is not of record. Until such sales are ruled out, the categorical denial of the existence of a foreign value may not be asserted. We cite the case of *United States* v. *H. W. Robinson & Co., State Forwarding Co., & Edgar S. Bibas,* 19 C.C.P.A. (Customs) 274, T.D. 45436, as authority for the proposition that resale prices of wholesalers are acceptable as a basis from which to derive a foreign value, if such prices accord with the statutory requirements of being freely offered for home consumption to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade.

Without commenting upon the character of resales by wholesalers and, indeed, without any reference to the evidence with respect to those transactions, the court in the incorporated case held that the restrictions of the importers "reached out and restrained all purchasers except the retail stores which sold only to the ultimate consumers" and, therefore, that there were no free offers or sales and, hence, no United States value for the birdcages there involved. It does not now seem evident from the record as presently constituted that sales at the wholesale level were so restricted in fact or in effect. There are vague and unsubstantiated statements that the respective exclusive wholesalers were advised that they could not sell in areas where there were other exclusive representatives, but it is not at all clear that any penalties would have been incurred had these wholesalers sought out customers in the allegedly restricted areas.

The court is of opinion that the views expressed by our appellate court in *United States* v. *Glanson Co.* (C.A.D. 740), *supra,* to the effect that a suggested course of procedure unaccompanied by sanctions against deviations therefrom does not constitute such a restriction as would create a controlled market, are herein relevant.

It has not been here established, insofar as wholesalers are concerned, that similar merchandise was not freely offered for sale to all purchasers, in the principal markets of the United States, in the usual wholesale quantities and in the ordinary course of trade. Accordingly, it is the court's view that the presumption of correctness of the appraiser's finding of value has not been overcome.

The court, therefore, makes the following findings of fact:

1. The merchandise covered by the instant consolidated appeals for reappraisement consists of birdcages exported from Germany during the years 1955, 1956, and 1957.

2. Said merchandise was appraised on the basis of United States value, as that value is defined in section 402(e) of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938.

3. It is claimed that the proper basis of value for the merchandise herein involved is cost of production, as defined in section 402(f) of said act, and that such values are equal to the entered values.

4. At all times pertinent hereto, the importer of the merchandise here involved sold a major portion thereof through its own retail outlets in major department stores.

5. Such sales as the importer made to wholesalers were negotiated under special circumstances and were limited to two mail-order houses and one five- and ten-cent chain.

6. Similar birdcages exported from Germany were sold at wholesale by three other American importers, but sales thereof were made to selected wholesalers only.

7. Notwithstanding testimony to the effect that such selected purchasers were restricted, by oral agreement, to designated areas for resale to retailers, the record fails to establish that such alleged restrictions were enforced, policed, or even observed.

8. There is no satisfactory evidence to establish that wholesalers did not freely offer similar merchandise for sale to retailers in accordance with the statutory definition of United States value.

The court, therefore, concludes:

1. That such merchandise was not freely offered for sale to all purchasers in the principal markets of the United States within the contemplation of section 402(e) of the Tariff Act of 1930, as amended.

2. That the evidence is not sufficient to establish that similar merchandise was not so freely offered for sale.

3. That the presumption of correctness of the appraiser's finding of value has not been overcome.

Judgment will be entered accordingly.